IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA


RITA J. ZIMBELMAN and ) Civil Action No. 3:97-592-MJP
KAREN MICHALIK, )
 )
            Plaintiffs, )
 )
      vs. )
 )
COL. STEVEN S. SAVAGE, et al. )
 )
            Defendants. )
_____ )
RITA ZIMBELMAN and ) Civil Action No. 3:98-348-MJP
KAREN MICHALIK, )
 )
            Plaintiffs, )
 )
      vs. )
 )                     OPINION AND ORDER
UNITED STATES OF AMERICA, )          FINDINGS OF FACT AND
 )                     CONCLUSIONS OF LAW
            Defendant. )
_____ )

        Plaintiffs commenced these actions against the United States for damages after they were

terminated from their Air Force jobs in March 1995.  The first case, Civil Action 97-592, was filed

pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388

(1971), alleging several constitutional violations, among them that the Air Force violated their Fifth

Amendment rights by failing to grant them a name-clearing hearing.  This Court denied Defendant's

motion for partial summary judgment on the Fifth Amendment claim.  The United States Court of

Appeals for the Fourth Circuit reversed this Court's decision and remanded the case with

instructions to dismiss Plaintiffs' Fifth Amendment claim.  Zimbelman et al. v. Savage, et al., 228

F.3d 367 (4th Cir. 2000).  The second case, Civil Action 98-348, was filed pursuant to the Federal

Tort Claims Act, 28 U.S. C. § 1346. The cases were consolidated for trial, the parties having stipulated that the sole Defendant is the United States of America.

## I

It appears from the evidence that Shaw Air Force officials received information that alleged acts of misconduct by employees of the Shaw Air Force Base Officers' Club had occurred at various times. An investigation by the Office of Special Investigations (OSI) personnel was commenced in September 1994. Military and OSI officials decided to schedule a mandatory meeting of all employees of the Officers' Club on March 13, 1995, and confront them with the allegations of misconduct. The employees were not initially advised concerning the true purpose of the meeting. Instead, they were told that the purpose was to bid farewell to Plaintiff Rita Zimbelman who was leaving Shaw Air Force Base to become the manager of the Officers' Club at Dobbins Air Force Base, a position which she had already accepted. Both Plaintiffs Rita Zimbelman and Karen Michalik, along with the other Officers' Club employees, attended the meeting in accordance with the mandatory notice.

## II

### Findings of Fact

Plaintiffs, Rita Zimbelman and Karen Michalik, complain that on and after March 13, 1995, tortuous wrongs were committed against them by military officials and civilian employees of the OSI at Shaw Air Force Base. Specifically, they allege and Defendant denies that on March 13, 1995, Defendant's agents and employees arrested and detained them against their will at Shaw Air Force Base and held them without an arrest warrant and without probable cause for "nearly eight hours" and thereafter "through its law enforcement personnel, disseminated information into the community that was both false and misleading" which "implicated both plaintiffs in criminal

activity." Plaintiffs allege (and Defendant denies) that Defendant's employees transmitted false and misleading information concerning Plaintiff Zimbelman to a prospective employer who had already agreed to hire (Zimbelman) to manage the Dobbins Air Force Base Officers' Club" and thereby caused (Zimbelman) to lose the Dobbins Air Force Base job; and that they wrongfully terminated both Plaintiffs from their employment with the Defendant claiming falsely that Plaintiffs had committed various criminal acts. Plaintiffs allege (and Defendant denies) that Defendant's law enforcement agents and employees maliciously and without cause prosecuted Plaintiff Zimbelman for alleged criminal violations; and that (Zimbelman) has been acquitted of all charges. Plaintiffs allege (and Defendant denies) that they have suffered damages that were proximately caused by the aforementioned acts of Defendant's agents and employees, including but not limited to past and future wages, employment opportunities, standing in the community, and mental anguish. Plaintiffs allege (and Defendant admits) that they have properly given notice and have exhausted all administrative remedies under the Federal Tort Claims Act for the following violations:

1. that Plaintiff Zimbelman has been maliciously prosecuted, falsely arrested, falsely imprisoned, had her right to privacy violated, and has suffered the intentional infliction of emotional distress; and

2. that Plaintiff Michalik has been falsely arrested, falsely imprisoned, had her right to privacy violated and suffered the intentional infliction of emotional distress.

In its answer, Defendant United States admits that Plaintiffs filed claims with the Department of Defense concerning the matters alleged in their complaint and that Plaintiffs have exhausted their administrative remedies, but asserts that it is not liable to Plaintiffs because all acts complained of in the complaint were done by Defendant's agents and employees in good faith, in the exercise of their assigned duties with reasonable belief in the validity of all acts committed by them.

1.      Plaintiffs Rita Zimbelman and Karen Michalik have timely filed this lawsuit for false arrest, intentional infliction of emotional distress, and invasion of privacy.  Rita Zimbelman has additionally timely filed a malicious prosecution claim.

2.      Prior to that, on March 6, 1997, Rita Zimbelman and Karen Michalik timely filed a notice of claim against the United States concerning the matters raised by the pleadings in this case.  (Stipulation of the parties at the trial of this case).

3.      These claims were rejected by the United States Air Force on August 15, 1997.  (Stipulation of the parties at the trial of this case).

4.      Plaintiffs have withdrawn their claim for invasion of privacy.   (Statement of Plaintiffs' Counsel at the close of Plaintiffs' case).

5.      The evidence shows that Plaintiffs and around forty other individuals were ordered to attend a "mandatory meeting" at the Shaw Air Force Base Officer's Club on March 13, 1995.  The employees attended because they were ordered by Colonel Filan, the Commander of the Services Group Squadron. Colonel Filan ordered the meeting at the request of the Office of Special Investigation Detachment 212 at Shaw Air Force Base.  The employees attending believed this "mandatory"  meeting was actually a going away party for Plaintiff Zimbelman.  **(Testimony of Colonel Filan; Karen Michalik, Vol. 3 p.50 lines 21-22; Testimony of Leona White, Vol. 2, p.42 lines 1-20; Rita Zimbelman, Vol. 1 p.38 - 39).**

6.      The purpose of the meeting was to interrogate the employees of the club concerning alleged wrongdoing.  **(Testimony of Colonel Carey deposition, p.15 line  4  to p.16, line 3).**  Many of the employees, including both Plaintiffs, had already been designated as "suspects" by the Office of Special Investigation as a result of a criminal investigation that was opened in January 1995.  **(Testimony of Agent Capps, Vol.2, p.126 line 22 to p.127 line 6; and Defendant's Exhibit One).**

7.     One of the employees, Leona White, who is not a party to this case, has corroborated Plaintiffs' version of the events.  Specifically, Plaintiffs and this witness testified that the following took place:

(a)     At the beginning of the meeting, Colonel Filan accused all present of being thieves. **(Testimonies of Leona White, Vol.2, p.45 line 23 to p.46 line 21; Rita Zimbelman, Vol.1 p. 41, line 23 through p.42 line 2; and Karen Michalik, Vol.3 p.51 line 17 to p.52 line 5; Defendant's Exhibit 19).**[1]

(b)     Colonel Filan told the employees that there was video tape evidence showing that all the employees had been stealing from the Officer's Club. **(Testimonies of Leona White, Vol.2 p.48 lines 11-16;  and Karen Michalik Vol.3 p.51 line 17 to p.52, line 5).**

(c)     At the mandatory meeting Colonel Filan told the employees that they were

---

[1]There are two significant reasons for this morning's meeting.

The first is that, in February, the Club showed a profit of $750.00.  That is the first time in ___ months that the Club has shown any profit at all.

The second reason for this meeting is that, while we're now making money, we would undoubtedly have made a lot more, but for certain activities in which many of you are engaged.

Since September of 1994–some 7 months ago–the Air Force Office of Special Investigations has been conducting an extensive investigation into this Club.  The investigation has included both technical and agent surveillance.  And it has revealed outright criminal conduct: theft of money, theft of goods, unauthorized eating and drinking, and, on top of all that, absolutely deplorable health and sanitary standards.

All this comes at the worst possible time–when the Club is already under close headquarters air combat command scrutiny.  And all this is and for a long time will be a considerable source of embarrassment to me, the services squadron and wing leadership.  And it should be a tremendous source of embarrassment for you, too.

As I told you, the OSI investigation included technical surveillance.  That included at least 20 video cameras placed in the strategic locations throughout the Club–in the kitchen, the main dining room, over cash registers, in the top gun lounge, the cashier's cage, outside the back door, and elsewhere.  These cameras were monitored nearly around the clock by teams of OSI agents.  The cameras could record the finest details–even cash register transactions–right down to the bills in the cash drawer.  Let me show you what the cameras saw. [Roll videotape].

The OSI investigation has recorded nearly all of you involved in some form or forms of criminal activity, be it theft, pilferage, or simply unauthorized eating or drinking.  Based on all the evidence, I expect to exercise a full range of disciplinary actions against many of you–from reprimands to removals.  I've also asked the Staff Judge Advocate and the two special Assistant United States Attorneys on his staff to prosecute several of you in the United States District Court in Columbia.

Now, Special Agent Capps is going to tell you what's going to happen next.

**(Colonel Filan's speech, Defendant's Ex. 3).**

to be split up and to await their interviews.  Colonel Filan and other OSI Agents indicated that the employees could not go until after they were interviewed. **(Testimonies of Karen Michalik, Vol.3 p.69 line 22 to p.70 line 10;  Rita Zimbelman, Vol.1 p.43 line 7 to p. 44 line 21;  and Leona White, Vol.2 p. 48 lines 11-16; Vol.2 p.52 line 10 to p.53 line 21; Vol.2, p.54 line 12; Vol.2 p.57 lines 15-18,).**  At one point, Mrs. White asked to go because she was sick and was told to go sit down.  **(Vol.2 p.50 lines 1-8).**

(d)  On March 13, 1995, during the mandatory meeting, various employees frequently requested to leave, to use the telephone or to go to the bathroom.  They were not allowed to leave.  They were escorted to the bathroom by agents and if they had to make a telephone call, they were escorted by agents who would listen in on their conversations. **(See cites above and testimony of Agent Welch, Vol.4 p.139).**

(e)  After the interrogation, each employee was sent to Colonel Filan who would either tell them to go home and await word, or hand them termination papers. **(Testimony of Colonel Filan, Vol.4 p.139).**

8.  The accusations of criminal conduct by Colonel Filan were repeated in the local newspapers in the days following this operation.  This publicity was coordinated by Colonel Carey. **(Testimony of Colonel Carey, deposition p. 101 line 15 to p.102 line 10; and Plaintiffs' Exhibit 14).**  These public accusations of criminal conduct were intended to include Plaintiff Michalik. **(Deposition of Colonel Carey, p. 103 line 6 to p.104 line 12).**

9.  Plaintiff Zimbelman is required to carry the burden of evidence to support the following elements for her claim of malicious prosecution:

(a)  Institution or continuation of original judicial proceedings, in this case, a criminal prosecution. (See Plaintiff's Exhibit 53);

     (b)     That this action was done by Defendant, or at the instance of Defendant. **(<u>See</u> deposition of Colonel Carey who testified that the recommendation to prosecute Rita Zimbelman was based on the "considerable evidence that had been adduced by the OSI investigation," p.35 line 10 to p.36 line 12**);

     (c)     Termination of proceedings in Plaintiff's favor. **(<u>See</u> Plaintiff's Exhibit 52**);

     (d)     Want of probable cause, (<u>see</u> discussion infra); and

     (e)     Resulting injury or damage.  (<u>Jordan v. Deese</u>, 452 S.E.2d  838, 879 (S.C. 1995)).

10.    Plaintiff Michalik is required to carry the burden of evidence for the following elements to support her claim for false arrest which is a form of false imprisonment:

     (a)     Acts of Defendant to deprive Plaintiff of her liberty.  It is not required that Plaintiff prove that she was confined within a prison.  It is only required that she show that by words or acts, Defendant's agents operated on the will of Plaintiff to confine her. <u>Westbrook v. Hutchison</u>, 10 S.E.2d  145 (S.C. 1940).

     (b)     An illegal arrest.  A false arrest occurs in the State of South Carolina when there is such an imprisonment as outlined above and there is no authority to arrest.  Under South Carolina law, there is no authority to arrest for a misdemeanor that is not committed in the presence of a law enforcement officer.  Even if there is an arrest based on the commission of a misdemeanor in the presence of an officer, the arrest must be made "at the time of the violation of law or immediately thereafter."  (<u>See</u> South Carolina Code § 17-13-30).

     (c)     Assuming legal authority to arrest Plaintiff Michalik, the arrest would still be false unless it was based on the probable cause that a crime had been committed.  Such

probable cause is defined as a "good faith belief that a person is guilty of a crime when the belief rests on such grounds as would induce an ordinarily prudent and <u>cautious</u> person, under the circumstances, to believe likewise." This must be more than "mere suspicion or belief" that a crime has been committed (emphasis supplied by Court). <u>Thompson v. Smith</u>, 345 S.E.2d 500 (S.C. 1986).

(d)     The tort of false arrest also requires resulting injury or damage. (<u>See</u> discussion infra).

11.     Although Colonel Peter Carey, the Staff Judge Advocate, has testified that the interrogations on March 13, 1995 were to be non-custodial, he also testified that he did not hear the OSI Agents or Colonel Filan tell these people that they would be free to go at any time**. (Deposition of Colonel Carey, p.56 lines 5, & 12-18; p.57 line 5 - 48, line 20; p.59 lines 2-6).** In fact, Carey testified that he had told the OSI Agents to inform these people they were free to leave before they were split into groups and then again before their individual interrogations. **(Deposition of Colonel Carey, p.58 line 21 to p.59 line 11).** Several facts lead to the conclusion that his advice was not followed:

(a)     The statement of Agent Tom Welch clearly shows that it was his intent to keep these employees at the club incommunicado. **(Agent Welch's statement and Plaintiff's Exhibit 9; compare Colonel Carey's deposition, p.58 line 21 to p.59 line 11).**

(b)     Perhaps the most telling testimony in this regard was from Special Agent James Capps' who unequivocally stated at trial that if either Plaintiff had attempted to leave, they, as suspects, would have been held. He cited the fact that each was a suspect as justification for this intent and further testified that he had been so instructed by the "legal office." **(Testimony of Capps, Vol.2 p.126 line 22 to p.127 line 6).** This testimony is in

direct conflict with the testimony of Detachment Commander Michael Goodrich that the individuals were told that they could go at any time. Capps' testimony, in combination with Welch's statement (**Plaintiffs' Exhibit 9**) lead to the conclusion that Agent Goodrich is not credible when he claims that he told Karen Michalik that she could go several times before and during her interview. **(See Plaintiff's Exhibit 9, Welch's Statement; and above-cited testimony of Agent Capps).**

(c)    There is another reason that Agent Goodrich's testimony in this regard does not have credibility. According to Goodrich's testimony, the OSI utilizes a form numbered 73 which is used to designate various data for each interview of a witness or suspect. **(See page 20 of Defendant's Exhibit 9)**. Such a form was filled out for the interview of Karen Michalik. This form has a section where the various rights that were given Michalik were designated. There is no designation showing the "non-custodial rights" were given. **(Testimony of Agent Goodrich, Vol.5 p.122, lines 11-13).** Although Agent Goodrich attempts to explain this by saying that there was no way to designate "non-custodial rights", the Court finds this testimony incredible. There is ample space on this section of the form to indicate that "non-custodial rights" were given to Michalik. **(See Defendant's Exhibit 9 page 20, and testimony of Agent Goodrich, Vol.5 p.92 line 4 to p.93 line 8).**

(d)    The absence of such a designation, in addition to the above-cited testimonies of Agents Capps and Welch, strongly supports the testimonies of Karen Michalik and Rita Zimbelman in that they were never told of the intended non-custodial nature of the interview.

(e)    Further, the testimony of Colonel Carey is very revealing with respect to the OSI Agents' claims that each employee was told that the interview was non-custodial. As the Court has already noted, Colonel Carey testified that he never heard any of the OSI

Agents, or anyone else, tell the individual employees that they could go that day. Further, Carey testified that the employees were not given "Miranda" warnings because he did not want to "chill" their testimony. **(Deposition of Colonel Carey, p.17 line 18 to p.18 line 1).** This testimony does not make sense. It is apparent to the Court that Carey was more concerned about getting the employees to talk than in allowing them to exercise their own judgment about being able to leave.

(f)     Colonel Carey appears to believe that such confinement is permissible so long as you pay the employee for the time that they are confined. **(Deposition of Colonel Carey, p.20 lines 17-23).** The Court is unfamiliar with any law that permits an employer to confine or restrict the liberty of his employees so long as he pays them for the time confined.

12.     The Court finds that Plaintiffs and Leona White are credible when they testified that Colonel Filan and the agents told Plaintiffs that they could not leave the club until their interviews were completed. They are also credible when they describe how their sense of confinement was reinforced when they were denied food and water, denied use of the telephone without an escort, and denied use of the bathroom facilities without an escort. Mrs. White was also credible when she testified that she asked to leave the club because she was sick and was told by the OSI Agents she could not go. Based on these facts and circumstances, the Court finds that Plaintiffs' freedom was restrained for the period of time that they were required to remain in the club on March 13, 1995.

13.     As stated, South Carolina law holds that a restraint of freedom sufficient to support a cause of action for false arrest can be shown where there has been a use of words sufficient to impart to Plaintiffs that they are not free to go. Given the facts and circumstances noted above, the Court finds that the preponderance of the evidence shows that Plaintiffs' freedom was restrained on March 13, 1995, sufficient to support a claim for false arrest.

14.     In order to support a cause of action for false arrest, Plaintiffs' must also show malice.  Under the law for the Federal Tort Claims Act, the malice must be shown on the part of the OSI  Agents in that such a tort is only recoverable against law enforcement personnel.  (18 U.S.C. 2680(h)).

15.     Plaintiffs may show malice by showing ill-will on the part of Defendant's law enforcement agents, or it may show such a total lack of probable cause as to imply malice.

16.     In this case, Plaintiffs have shown malice in both ways.  As to Rita Zimbelman, there is no evidence introduced by Defendant to support any probable cause to believe that she was guilty of any crime.  Under the law, the probable cause need not be proof beyond a reasonable doubt, but it still must be sufficient evidence to "excite belief in a reasonable mind acting on the facts within the knowledge of the prosecutor that the person charged was guilty of a crime for which he was charged, and only those facts and circumstances which were or should have been known to the prosecutor at the time he instituted the prosecution." Melton v. Williams, 314 S.E.2d 612 (S.C.App. 1984).   The relevant testimony showed the following:

(a)     Rita Zimbelman testified that she was asked to hold money that had been collected by her staff for a deceased employee named Mary Davis.  It was raised originally to defray funeral expense. This money became known as "Mary's money."  **Testimony of Rita Zimbelman, Vol.2 p.15 lines 24 - 25;  and Leona White, Vol.2 p.38 lines 10-11).**

(b)     Leona White also testified that there was a dispute over what to do with the money after it was learned that there was sufficient insurance money to pay the funeral expenses. **(Testimony of Leona White, Vol.2 p.31 lines 14-17.**

(c)     Rita Zimbelman agreed to hold the money until the staff decided what to do with it. **(Testimony of Leona White, Vol.2 p.32 lines 12-15).**

(d)     Apparently, no one ever told Rita Zimbelman what to do with the money. **(Testimony of Leona White, Vol.2 p.38 line 19 to p.39 line 16).**

(e)     Leona White testified that no one ever asked for the money. **(Testimony of Leona White, <u>see</u> above and Vol.2 p.39 line lines 17-21).**

(f)     Rita Zimbelman testified that on March 11, 1995, she gave the money to another employee Shirley Curry, the head waitress, to buy bonds for the grandchildren of Mary Davis.**(Testimony of  Rita Zimbelman, Vol.1 p.49 lines 14-21).**

(g)     Rita Zimbelman testified that on March 13, 1995, when she was first asked about the money by Agent Capps, she told him that the money had been given to another employee to buy bonds for the grandchildren on March 11, 1995. Zimbelman needed to do so because she was leaving to go to Dobbins Air Force Base and could no longer hold the money.  **(Testimony of Rita Zimbelman, <u>see</u> above).**

(h)     Agent Capps admits that Rita Zimbelman told him that she had given the money to another employee on March 11, 1995, two days before his arrest and interrogation of Mrs. Zimbelman on March 13, 1995. **(Testimony of Agent Capps, Vol.2 p.124 line 1 to p.125 line 3).**

(i)     Agent Capps claims that he gave this information to Colonel Carey, the officer that ultimately recommended prosecution of Rita Zimbelman for conversion of this money. Colonel Carey testified unequivocally, however, that he was never told that Rita Zimbelman had provided this information in her initial interview on March 13, 1995.  In fact, Colonel Carey testified that had he known that she had provided this explanation in her initial interview, he would have considered this to be a "huge fact." **(Deposition of Colonel Carey, p.112 line 16 to p.114 line 7).**

(j)     Colonel Cary further testified that not knowing that Rita Zimbelman had provided this explanation was a very big part of his conclusion that she had a criminal intent. **(Testimony of Colonel Carey, <u>see</u> above).**

(k)     Simply put, the Court finds it incredible that Agent Capps supplied this information to Colonel Carey in light of Carey's reaction during his deposition.

(l)     The Court finds that there was no probable cause to arrest Rita Zimbelman before the mandatory meeting.  Once Zimbelman provided the information that the money had been given to another employee for the purpose of buying bonds for the grandchildren of Mary Davis, there was not even a mere suspicion of criminal conduct remaining with respect to this charge.

(m)     The two other possible areas of probable cause that the Government contended rose to the level of a criminal charge against Rita Zimbelman was an allegation that she had taken a typewriter with the intent to convert it, and that she had allowed government property to be taken by other employees from the Officers' Club.  **(Testimony of  Rita Zimbelman, Vol.1 p.63 line 20 to p.64 line 8).**

(n)     The typewriter could not have been the source of probable cause on March 13, 1995, because the government knew nothing about it until Mrs. Zimbelman told Colonel Carey about it when she was voluntarily making a statement concerning the charges against her.  **(Deposition of Colonel Carey, p. 38 lines 2-16).**  This was after March 13, 1995. **(Deposition  of Colonel Carey, p.38 lines 5-7).**  Further, the charge made against her in this regard has no merit.  It is uncontroverted that  Zimbelman's daughter checked the typewriter out under a hand receipt, that it was inadvertently packed with Zimbelman's belongings on March 13, 1995 while she was under arrest at the Officers' Club, and that she

brought it to the government's attention at a later time. **(Testimony of Rita Zimbelman, Vol.1 p.71 line 25 to p.72 line 15).** Finally, she returned the typewriter when she was able to access her belongings which remained in storage for a lengthy period of time while she searched for a home large enough to bring all of her belongings out of storage. **(Testimony of Rita Zimbelman, <u>see</u> <u>above</u>).** The Court notes that the parties have stipulated that this charge was dismissed by the Government on the eve of the criminal trial of Zimbelman. **(<u>See</u> <u>also</u> Plaintiffs' Exhibit 52).**

(o)        As to the property that Rita Zimbelman allegedly allowed other employees to take, she testified that such property was borrowed under the rules and regulations of the Officers' Club. **(Testimony of Plaintiff Rita Zimbelman, Vol.1 p.71).** It is noted that the Government did not contest her assertion in this regard. It is also noted that Leona White testified that this property was frequently borrowed and returned under the hand receipts by employees and club members and their dependents. **(Testimony of Leona White, Vol.2 p.62 lines 5-14).** The Court finds that these facts did not give rise to any probable cause that Mrs. Zimbelman had committed a crime on March 13, 1995, or any time thereafter.

(p)        With respect to the issue of probable cause, it should be noted that the Government seeks to justify the actions of the OSI Agents based on the untested allegations of two confidential informants. One was Michele Trumbull and the other was Michele Zalasky. Although it is alleged that these persons had information at the time of the investigation, it is noted that neither of these so-called "reliable informants" were called by the government to verify under oath that they had made allegations against Plaintiffs. The Court, therefore, has decided not to give any credence to the assertions of OSI with reference to these confidential informants.

(q)      The Court, therefore, finds that the Government did not have any probable cause to arrest or prosecute Rita Zimbelman.  In this regard, the Court shares Magistrate Judge Buchanan's concern that the prosecution of Rita Zimbelman had proceeded without any "reasonable inference" of guilt.  **(Plaintiff's Exhibit 52, Vol.2 p.39 line 17 to p.40 line 17.)**

17.      On the issue of probable cause for Karen Michalik, the testimony showed the following:

(a)      Karen Michalik testified that she was accused of time card fraud on March 13, 1995.  **(Testimony of Karen Michalik, Vol.3 p.68 line 1 to p.69 line 21).**  At some time later than March 13, 1995, she was accused of consuming club food, allowing another employee to drink alcohol while counting cash in a cashier's cage, and she informed the OSI that she gave a free drink to a fellow employee named Robert Brown.  **(Testimony of Karen Michalik, Vol.3 p.72 lines 6-24).**  (The Court notes that Karen Michalik does not have a malicious prosecution suit.  She asserts a false arrest on March 13, 1995.  Therefore, the allegations against her as to the employees conduct and the free drink to Brown do not give rise to probable cause on the issue of false arrest on March 13, 1995.)

(b)      Karen Michalik testified that she did indeed taste test some vegetables several times before they were plated-up.  She said she was stirring the vegetables and checking the application of the seasoning by taste testing them.  She was helping the cook prepare the food to be plated-up for service at the Officers' Club function.  **(Testimony of Karen Michalik, Vol.3 p.67 lines 7-10).**  The Court cannot conceive of any set of facts that would indicate that a person responsible for preparing food would be guilty of a crime for taste

testing the food that they are responsible for serving!  **(Testimony of Karen Michalik, Vol.3 p.66 lines 17-20).**

(c)     It is noted that the Government did not introduce any testimony to refute Karen Michalik's testimony in this regard.  In other words, no one denied that she was "taste-testing" the food for which she was accused of stealing.

(d)     Karen Michalik testified that the so-called time card fraud was raised during her initial interview on March 13, 1995, but never pursued by the Government.  She said that she had two time cards, one for her duties as the Night Manager and the second for her duties as a Bartender.  These duties were performed on the same date and would require that she clock out on one job and clock in on the other during the same shift.  She testified that the times on each card never overlapped.  **(Testimony of Karen Michalik, Vol.3 p.68 line 1 to p.69 line 21).** No evidence was introduced by the Government to refute her testimony or to substantiate the charge of time card fraud.  The Court notes that given this explanation by Michalik, it would have been a simple matter to review the cards before March 13, 1995.  There was no reasonable evidence in this matter showing probable cause to believe that she had committed a crime.

(e)     As stated, the Court finds that the matter of allowing an employee to drink in the cashier's cage did not come up until after March 13, 1995, and thus could not represent probable cause on that date to arrest her.  However, it should be noted that such a matter would not rise to the level of criminal conduct under any charge known to the Court.  It is further noted that Colonel Carey did not believe that it constituted criminal conduct either.  **(Deposition of Colonel Carey, p. 104 line 8 to p.105 line 15).**

(f)     Likewise, the allegation that Michalik gave a free drink to Robert Brown did not come up until after she was interviewed on March 13, 1995,[2] and thus would not be probable cause to arrest her on that date. Further, Karen Michalik testified that she did so to compensate Robert Brown for three hours that he had worked off the clock and that she had previously noted this fact in the night manager's log. She further testified that this was the common practice at the club. **(Testimony of Karen Michalik, Vol.3 p.73 lines 5-9).**

(g)     With respect to the issue of probable cause, it is worth noting that the agents had videotaped an Air Force Officer, Colonel Jolly, eating from a tray of food in the kitchen of the Officer's Club. Further, this was noted in their surveillance log. **(See Plaintiff's Exhibit 34 and the testimony of Agent Capps, Vol.2 p.138 line 13 to p.139 line 6).** No charges were brought against this man for any violation of his military duties. **(Testimony of Agent Capps, Vol.2 p.146 lines 1-6).** The Court can only conclude from this that the testimony of Zimbelman and Michalik concerning the casual attitude toward the food and drink at the club applied to the Officer members as well as the staff. Under such circumstances, it would be highly inappropriate to charge employees with a crime for use of food and drink to further the club's business, i.e., taste testing and giving an occasional drink to obtain the services of an employee off the clock, and then to let officers go unpunished for consuming food and drink for their own purposes.

18.     From all these facts and circumstances, the Court finds that there was a total lack of probable cause to arrest Karen Michalik on March 13, 1995.

---

[2]Apparently, Colonel Filan, in attempting to cut costs for club operations had dictated that there would be no overtime. Plaintiff Zimbelman, and other managers, were forced to find ways to get work out of certain employees while they were off the clock. Thus, Ms. Zimbelman allowed loyal and dedicated employees like Robert Brown to work off the clock. Both Zimbelman and Michalik testified that they would sometimes pay employees for doing this work by giving them free drinks. On this occasion, Robert Brown was given one free drink for working three hours off the clock.

19.     There is also evidence and testimony of ill-will directed specifically toward Plaintiffs. This testimony and evidence is as follows:

(a)     According to the testimony of Agents Capps and Goodrich, Michele Zalasky and Michele Trumbull served as the sole sources of information at the outset of the investigation. **(Testimonies of Capps, Vol.2 p.96 line 11 to p.97 line 6; and Goodrich, Vol.5 p.129 lines 5-10).**

(b)     Agent Capps served in the same OSI Detachment as Michele Zalasky's husband. Michele Zalasky's husband was named George Zalasky. **(Testimony of Agent Capps, Vol.2 p.94 - p.100).**

(c)     Michele Trumbull and Michele Zalasky became upset with Rita Zimbelman about the way that Rita had handled a complaint about a watermelon basket. The watermelon basket had been made for Michele Zalasky by one of the employees at the Officers' Club. Apparently, Zalasky and Trumbull alleged that the basket had been made with Club food. Rita Zimbelman had concluded otherwise. **(Testimonies of Leona White, Vol.2 p.70 line 21 to p.73 line2, Vol.2 p.73 line2, Vol2. p.73 lines12-15; Rita Zimbelman, Vol.1 p.94 line 5 to p.95 line 19).**

(d)     Michele Zalasky became very upset in November or December, 1994 about another incident involving a cook by the name of Sammie. During this incident, and its aftermath, Michele Zalasky made the statement that she would have Rita Zimbelman's job. **(Testimony Karen Michalik, Vol.3 p.45 line 6 through p.49).**

(e)     On the day following this incident, George Zalasky stated to Karen Michalik that if Rita Zimbelman did not apologize to his wife that she would not be back at work. **(Testimony Karen Michalik, Vol.3 p.49).**

(f)    The Court notes that neither George Zalasky nor Michele Zalasky were called by the Government to refute this testimony.

(g)    According to Agents Welch and Goodrich, the first that they remember hearing about allegations of wrongdoing at the Officers' Club was from Agent Zalasky. **(Deposition of Agent Welch, p.113 lines 8-25; and Goodrich, Vol.5 p.132).**

(h)    Following this incident on January 31, 1995, George Zalasky approved the investigation into the activities of the Officers' Club employees. **(See Defendant's Exhibit 1 and testimony of Agent Capps, Vol2 p.114 line 13 to p.115 line 2).**

(i)    Following this incident, according to the records of the OSI , George Zalasky endorsed the use of Michele Trumbull as a confidential informant. **(See Plaintiff's Exhibit 23, and testimony of Capps, Vol.2 p.128 line 20 to p.129 line 8).**   The record, Plaintiff's Exhibit 23, does not show that Zalasky's endorsement was reviewed by the Detachment Commander, even though there is a space for his comments.

(j)    Agent Goodrich testified that Agent Zalasky should have stayed as far from the investigation as possible because of the problem of his partiality. **(Testimony of Goodrich, Vol.5 p.65 - p.66; and testimony of Agent Capps, Vol.2 p.110 lines 21-25).**

(k)    Nevertheless, the records show that Agent Zalasky initiated the investigation and approved the confidential source. (**See above**).  In addition, OSI  records show that Agent Zalasky took over the interrogation of Karen Michalik for Agent Goodrich on March 13, 1995. **(See page 20, Defendant's Exhibit 9).**  Further, Karen Michalik testified that Agent Zalasky interrogated Michalik about conflicts between his wife and Rita Zimbelman and about her knowledge of an alleged sexual harassment of his wife.  **(See also testimony of Karen Michalik, Vol.3 p.80 line 14 to p.81 line 1.)**    Finally, it appears from this

documentation that he administered the oath to Karen Michalik before she made her statement. **(See page 15 of Defendant's Exhibit 9).**

(l)     Agent Capps testified that Michele Zalasky was an "open source" used by him to help with the investigation.  She was identified in various documents of the OSI as "OC-2."  **(Testimony of Agent Capps, Vol.2 p.103 lines 5-7, Vol.2 p.106 line 19 to p.108 line 18;  and Defendant's Exhibit 1, 8, and 9).**

(m)     Agent Capps further testified that the OSI report writing regulations required that Michele Zalasky be identified by her name in the "Report of Investigation."  **(Agent Capps' testimony, Vol.2 p.106 line 19 to p.108 line 18; and Plaintiff's Exhibit 48).**

(n)     Agent Capps testified that he does not remember that Michele Zalasky was identified by name in any of the Reports of Investigation in this case. **(Testimony of Agent Capps, Vol.2 p.101 line 19).**[3]

(o)     Agent Capps admits that Michele Zalasky was never identified by name as one of the sources of information in any report. He claims that as an open source it was his practice not to reveal an open source in spite of the regulation which clearly requires that an open source be identified. **(See Plaintiff's Exhibit 48 and testimony of Agent Capps, and Vol.2 p.154 lines 11-22 regarding stipulation of Plaintiffs' Exhibit 48).**

(p)     Thus, the Court concludes  that Agent Capps violated his own regulations to conceal the identity of Michele Zalasky.  The Court finds that this shows a pattern of subterfuge with respect to Michele Zalasky.  The Court concludes that Agent Capps violated his regulation to keep Michele Zalasky's identity a secret because of Agent Goodrich's

---

[3]Capps also admitted to violating this same regulation when he purchased her dinner almost two months after the takedown of the Club.  On this form, he withheld her name but identified her as a "carded source."  **(See Plaintiffs' Exhibit 56 and Testimony of Agent Capps, Vol.2 106 line 19 to Vol.2 p.108 line 18).**

concern that George Zalasky was not impartial and yet had been involved in several key decisions with respect to the investigation. The Court notes that although Agent Capps testified that confidential sources should be identified on the internal data pages for each report, Michele Zalasky is not identified on any of the internal data pages. **(Compare testimony of Agent Capps, Vol.3 p.5 lines 23-25 to Defendant's Exhibits 1, 8, and 9).**

(q) This, in combination with the Court's conclusions about the lack of probable cause as to Rita Zimbelman and Karen Michalik, shows malicious intent by the OSI Agents to conduct nothing short of a witch hunt against Zimbelman and Michalik.

(r) Further bolstering this view of the evidence is the testimony of Colonel Filan that Michele Zalasky came to him at the conclusion of the investigation to complain that she had not gotten a promotion to either dining room manager or night manager as a result of the club takedown. **(Testimony of Colonel Filan, Vol.4 p.170 lines 14-24).**

20. The Court finds, as set forth above, that Plaintiff Zimbelman has carried her burden with respect to each and every element. (The element of damage will be discussed below).

21. The Court finds, as set forth above, that Plaintiff Michalik has carried her burden with respect to each and every element. (The element of damage will be discussed below).

22. The Court, for the reasons set forth below, finds substantial evidence of continuing harassment of Plaintiffs by the OSI Agents and other Air Force Personnel, sufficient to support a claim for the intentional infliction of emotional distress and to demonstrate a deliberate indifference or malice in the acts of the Agents, Colonel Carey, Colonel Savage, and Colonel Filan. The Court notes that Defendant is subject to liability for this tort regardless of whether or not the actors or agents of the Government were law enforcement officers. (See generally, Truman v. U.S., 26 F.3d

592 (5th Cir 1994); <u>Sheehan v. U.S.</u>, 896 F.2d 1168, amended on other grounds, 917 F.2d 424 (1990).

23.     The specific facts that support the conclusions of harassment are as follows:

(a)     A telephone call by Colonel Savage to Dobbins Air Force Base was made for the specific purpose to inflict emotional damage on Rita Zimbelman by denying her the job that she had competed for and had accepted prior to March 13, 1995. The explanation supplied by Colonel Carey and the OSI Agents for doing this presupposes that they thought that Rita Zimbelman was guilty of some crime. As shown above, however, there was no evidence of any crime by Rita Zimbelman. Second, incredibly, Colonel Savage testified that he told the personnel at Dobbins on March 13, 1995, that Rita Zimbelman had been given the aforesaid Mary's money and that it could not be located. This is particularly bothersome when one considers that the OSI knew that day that Rita Zimbelman had given the money to another employee for the benefit of Mary's family. The Court can only conclude that Colonel Savage was also misled by Agent Capps about where the money was at the time of his interview of Rita Zimbelman on the 13th of March, 1995. **(Testimony of Colonel Savage, Vol.4 p.194 lines 15-17).** Such deceit by a law enforcement officer with the intention of preventing Zimbelman, a divorced mother supporting three teenage children, from moving on to another employment, surpasses the bounds of decency as this Court understands that term. This act alone supports a finding of intentional infliction of emotional distress with regard to Mrs. Zimbelman.

(b)     I also find that the evidence demonstrates that the entire investigation of Rita Zimbelman started as retaliation by George Zalasky, a highly placed OSI Agent. As stated,

George Zalasky was married to Michele Zalasky, a disgruntled club employee.[4]   In September 1994, George Zalasky was the Superintendent and Non-Commissioned Officer in Charge of the OSI Detachment which Agent Goodrich commanded. **(Testimony of Agent Capps, Vol.2 p.98 lines 10-12; and Agent Goodrich, Vol.5 p.62 - p.64).**  It is very clear to this Court,  from the evidence, that George Zalasky orchestrated the ensuing investigation by manipulating Michele Trumbull and his wife into positions of "reliable informants."  The Court further finds that Zalasky and Capps violated clear and unambiguous regulations by failing to disclose the identity of Zalasky's wife on routine reports.  From this evidence, the Court find an illegal motive existed in the start of this investigation and that it was intended and did serve the specific purpose of driving Rita Zimbelman and other employees from their jobs because of disagreements they had with the two Micheles.

(c)      The Court finds from the testimony of Joe Goss that the OSI  Agents and Colonel Filan continued to harass and intimidate Rita Zimbelman beyond the reach of Shaw Air Force Base.  The evidence shows that Colonel Savage called Joe Goss to tell him that Rita Zimbelman had been implicated in stealing club property and food.  **(Deposition of Jose Goss, p.14 line 12 to p.16 line 23).** As shown above, these allegations were totally groundless.  Based on the foregoing, the Court finds that the statement to Goss on March 13, 1995, was totally without support of any credible evidence.  As such, it supports an inference of malice and is further evidence of an intent to inflict emotional distress.

---

[4]Interestingly, Agent Goodrich acknowledges that both Trumbull and Zalasky were disgruntled employees. Goodrich contended that this made them more, not less, credible or reliable.  Of further interest is Agent Capps' denial that  he had knowledge that Trumbull or Zalasky were disgruntled.  When confronted at trial however, with his prior inconsistent testimony, he acknowledged their disgruntlement.

(d)      The testimony of Sue Pitts, likewise, shows an intent to inflict emotional distress upon both Rita Zimbelman and Karen Michalik.  The Court finds that in February 1996, the OSI went to the O'Donnell House where both Rita Zimbelman and Karen Michalik were working. They told Sue Pitts, Plaintiffs' supervisor, that Rita Zimbelman was using stolen equipment from Shaw AFB there at the O'Donnell House, and that Karen Michalik was committing fraud by drawing unemployment benefits while working.  **(Testimony of Sue Pitts, Vol.3 p.133 line 19 to p.134 line 25).**  In fact, the OSI could have easily verified that Michalik was not drawing unemployment from the Air Force.  Further, the OSI knew of no missing property that Zimbelman had from Shaw AFB, let alone was using, at the O'Donnell House.  **(Testimony of Goodrich, Vol.5 p.107 - p.109).**  There never was any inference at all that Zimbelman had taken any property from the club.  Both of these statements were completely false and were intended to cause emotional distress long after the investigation at the club had been concluded.  Thus, they also demonstrate malice.

(e)      The Court further finds that the OSI Agents and Colonel Filan's role in allowing Zimbelman's goods to be shipped to Dobbin's Air Force Base demonstrates a careless disregard for her rights and basic human needs.  As the testimony of Colonel Carey demonstrates, the Government was well aware that she was packing out on the day of the interrogations.  Yet, they would not allow her to call her children who were at her residence until late that afternoon, nor did they do anything to stop the pack-out.  The explanation that they did not want to "tip" Zimbelman off that the interrogations were taking place does not explain why no one took steps to stop the pack-out after Zimbelman had come to the meeting at 9:00 o'clock in the morning.  They did nothing while she waited until late in the afternoon

to finish her interview. By then it was too late to do anything about her personal belongings. It is not credible to contend, as the Government does, that no one could have stopped the pack-out anytime after 9:00 a.m. Rita Zimbelman had three (3) children and by then had no house to live in, and was without her and her children's belongings for weeks. Zimbelman was needlessly made to suffer. At one point, she was forced to live without her daughter, Sara, in her house for several months because she no longer had enough space for her. (She had given up their residence in anticipation of going to Dobbins AFB). Such a callous disregard for the needs of others supports the conclusion that these Government officials intended to cause emotional harm and further demonstrates malice.

(f)     Karen Michalik and Rita Zimbelman testified that the same groundless charges over which they were arrested and held on March 13, 1995, became the basis that the OSI pursued their terminations from employment. Rather than dispute this, Agent Capps introduced evidence that he did, in fact, present a document to the legal staff alleging that Karen Michalik did commit a theft. The document shows that she should be dismissed for certain violations of the rules and regulations of her employment. **(See Defendant's Exhibit 4, and testimony of Agent Capps, Vol.3 p.7 lines 9-20).** The same document made the same groundless allegations against Zimbelman. **(See Defendant's Exhibit 4, and testimony of Agent Capps. See also testimony of Agent Goodrich, Vol.5 p.127).**

24.     For the reasons outline above, the Court finds that the prosecution of Rita Zimbelman by the OSI Agents to have been totally without merit and the Court finds that there was no probable cause to proceed with the prosecution. For the reasons outline above, the Court also finds that there was abundant evidence of malice as outline above. For the reasons set forth below, the Court finds

that there is sufficient evidence of damage. The Court also finds that the evidence supports a determination that the prosecution of Rita Zimbelman was malicious.

25.     The Court finds that both Plaintiffs suffered a severe emotional trauma from the above-cited acts of the OSI Agents and other Governmental personnel. The Court finds the testimony of Plaintiffs in this regard to be uncontradicted and in fact to be totally supported by the Government's expert witness, Doctor Follingstad. Dr. Follingstad testified that in her opinion both women suffered a "Major Depressive Episode." She further testified that such episodes typically last two to three weeks but that Rita Zimbelman's lasted around two months and Karen Michalik's lasted eight to nine months.

26.     The Court finds that Rita Zimbelman is entitled to both special and general damages under South Carolina law for all the wrongs committed against her as found by this Court.

27.     The Court finds that Karen Michalik is entitled to both special and general damages under South Carolina law for all the wrongs committed against her as found by this Court.

The Court further notes that the Government has argued that no damages can be awarded which "arise out of" the tort of defamation. This, as a principle of law, is true. The fallacy of applying this principle to the case sub judice is illustrated graphically by the cross-examination of Rita Zimbelman. She had testified on direct examination about the devastating effect the public release of information about the Club employees arrest on March 13, 1995, had on her emotionally. **(Testimony of Rita Zimbelman, Vol.1 p.1 - p.81).** On cross-examination, the Government's attorney made the point, through Rita Zimbelman, that the newspaper articles were accurate in reporting that the employees **had** been accused of criminal conduct. While the Court appreciates that this would be a defense to the tort of defamation were Plaintiffs' seeking a recovery for same,

such is obviously not this case. Plaintiffs allege and seek recovery because of false accusations of criminal conduct in connection with their arrests. Thus, as counsel for the Government aptly points out, the damages that Plaintiffs seek recovery for do not "arise out of" the tort defamation because there was not publication of false information. Rather, the false accusation of criminal behavior is the essence of the tort for which Plaintiffs now seek recovery. The publication of this accusation, however accurate, served to aggravate any damages done by the initial accusation. For these reasons, the Court concludes that the emotional distress and general damages to reputation caused by the false accusation of a crime which was published in the local papers arise from the torts of false arrest and malicious prosecution and the intentional infliction of emotional distress, not from the tort of defamation. **(See Talbert v. U.S., 932 F.2d 1064, (4th Cir. 1991), requiring the Court to analyze the tort from which damage is alleged) and Taylor v. Domwick, 15 S.E. 591, 593-594 (S.C. 1892); Jones v. Ingles Supermarket, Inc., 361 S.E.2d 775 (S.C. App. 1987).**

28. From the combined testimonies of Plaintiff Zimbelman, Doctor Stewart, a vocational expert witness called by the Government, and Doctor Wood, Plaintiffs' economic expert witness, the Court finds that the evidence supports the award to Rita Zimbelman of lost wages and other benefits of $387,990 in terms of present dollars. The Court notes in this regard the baseless charges that were involved in the malicious prosecution. Certainly, no one should have to endure the shame and distress of fending off baseless accusations, but when it is coupled with the many acts of additional harassment by Governmental officials that Rita Zimbelman endured, the pain and suffering would, in my view, be great. The Court notes that South Carolina law permits the fact finder to make an award for mental pain and suffering, even in the absence of physical injury, where

the Plaintiff has sustained damage or mental injury.  (See <u>Doe by Doe v. Greenville Hosp. System</u>, 448 S.E.2d  564, 567 (S.C. 1994)).

29.     From the combined testimonies of Plaintiff Michalik, Dr. Stewart, a vocational expert witness called by the Government, and Dr. Wood, Plaintiffs' economic expert witness, the Court finds that the evidence supports the award to Karen Michalik of lost wages and other benefits of $390,408 in terms of present dollars.  The Court notes the testimony of Dr. Follingstad which shows that Karen Michalik suffered a depressive episode lasting for 8 to 9 months following the events of March 13, 1995.

# III
## Conclusions of Law

28 U.S.C. § 2674 states that:

> The United States shall be liable respecting the provisions of this title relating to tort claims in the same manner and to the same extent as private individuals under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages....

Thus, as a private individual or corporation would be liable to Plaintiffs for the acts alleged in the complaints, the above statute renders the United States liable. And significantly, liability of the United States extends to "acts or omissions of investigative or law enforcement officials of the United States government...which arise from 'assault, battery, false imprisonment, false arrest, abuse of process or malicious prosecution.'" 28 U.S.C. § 2680(h) states:

> Provided, that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(G) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso out of assault, battery, false imprisonment, false arrest, abuse of process or malicious prosecution. For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

In suits under the Federal Tort Claims Act, the law of agency of the place of the alleged tortuous conduct is applied to determine whether a government employee is acting in the scope of his employment. Williams v. United States, 350 U.S. 857 (U.S.Cal. 1955); Cooner v. United States, 276 F.2d 220 (4th Cir. 1960). The parties agree that the OSI officers are investigative and law enforcement officers, were employees of the United States, and were acting within the scope of their authority when they committed the acts complained of Plaintiffs. Therefore, Plaintiffs press their claims against the United States under the doctrine of *respondeat superior.* That doctrine is described by the South Carolina Supreme Court as follows:

29

The doctrine of *respondeat superior* rests upon the relation of master and servant. A plaintiff seeking recovery from the master for injuries must establish that the relationship existed at the time of the injuries, and also that the servant was then about the master's business and acting within the scope of his employment.

It is well settled that the liability of the master for the torts of his servant arises only when the servant is acting about the master's business, within the scope of his employment; if he is upon his own business acting outside of his employment, the master is not liable. An act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment and in furtherance of the master's business. These general principles govern in determining whether an employer is liable for the acts of his servant. Bolin v. Bostic, 111 S.E.2d 557 (S.C. 1959 ).

The act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment so as to render the master liable therefor. Under these circumstances, the servant alone is liable for the injuries inflicted. If a servant steps aside from the master's business for some purpose wholly disconnected with his employment, the relation of master and servant is temporarily suspended; and the master is not liable for his during such time. Hancock v. Aiken Mills, 185 S.E. 188 (S.C. 1936); Hyde v. Southern Grocery Stores, 15 S.E.2d 353 (S.C. 1941).

Thus, if the OSI officials acted unlawfully, the United States is liable for the resultant damages suffered by Plaintiffs.

**B**

The South Carolina Supreme Court has stated that false arrest and imprisonment consists in the unlawful restraint of an individual's personal liberty or freedom of locomotion. The essence of the tort is to provide protection of the personal interest in the freedom of each citizen employs as a matter of right from restraint of movement. Thomas v. Colonial Stores, Inc., 113 S.E.2d 337, 339 (S.C. 1960); Thompson v. Smith, 345 S.E.2d 500, 502 (S.C. App. 1986).

To establish a cause of action for false imprisonment, the Plaintiff must prove that: (1) the Defendant restrained the Plaintiff; (2) that the restraint was intentional; and (3) that the restraint was unlawful. Thomas v. Colonial Stores, 113 S.E.2d 337; Jones by Robinson v. Winn-Dixie Greenville, Inc., 456 S.E.2d 429 (S.C. App. 1995). While the term false imprisonment suggests being placed under lock and key, the tort is not limited to such actual physical interference with the liberty of the Plaintiff. It is sufficient that the Plaintiff submits to an apprehension of force reasonably to be understood from the conduct of the Defendant, although no force is used and there is no threat of imminent use of force. Wingate v. Postal Tel. & Cable Co., 30 S.E.2d 307 (S.C.App. 1944).

In a suit for false imprisonment, the basic injury is the depreciation of the Plaintiff's liberty. Jones by Robinson v. Winn Dixie Greenville, Inc., 456 S.E.2d 429; Caldwell v. K-Mart, 410 S.E.2d 21 (S.C. App. 1991). Such things as humiliation, indignity, and mental suffering are general damages that naturally and proximately result from false imprisonment. Westbrook v. Hutchinson, 10 S.E.2d 145, 150 (S.C. 1940). Recoverable damages also include specific losses from the restraint such as income while restrained.

## C

The tort of malicious prosecution ordinarily involves the institution of a criminal prosecution without probable cause. An action will also lie for the malicious prosecution of an ordinary civil

action. <u>Cisson v. Pickens Sav. & Loan Ass'n.</u>, 186 S.E.2d 822 (S.C. 1972); <u>Crowell v. Herring</u>, 392 S.E.2d 464 (S.C. App. 1990). The elements of the cause of action are:

1.   the institution of continuation of original judicial proceedings, either civil or criminal;

2.   by or at the instance of the defendant;

3.   termination of such proceedings in the plaintiff's favor;

4.   malice in instituting such proceedings;

5.   want of probable cause; and

6.   resulting injury or damage.

<u>Jordon v. Deese</u>, 452 S.E.2d 838, 879 (S.C. 1995); <u>Eaves v. Broad River Elec. Corp.</u>, 289 S.E.2d 414, 415 (S.C. 1982); <u>Ruff v. Eckerd Drugs, Inc.</u>, 220 S.E.2d 649 (S.C. 1975).

The South Carolina Supreme Court has defined probable cause as follows:

> By probable cause is meant the extent of such facts and circumstances as would excite the belief in a reasonable mind acting on the facts within the knowledge of the prosecution that the person charged was guilty of a crime for which he has been charged, and only those facts and circumstances which were or should have been known to the prosecutor at the time he instituted the prosecution should be considered.

<u>Brown v. Bailey</u>, 54 S.E.2d 769 (S.C. 1949); <u>China v. Seaboard Air Line Ry.</u>, 92 S.E. 335 (S.C. 1917); <u>Elletson v. Dixie Home Stores</u>, 99 S.E.2d 384 (S.C. 1957); <u>Parrot v. Plowden Motor Co.</u>, 143 S.E.2d 607 (S.C. 1965).

The absence of reasonable cause to believe that Plaintiff is guilty, not Plaintiff's actual guilt or innocence, is an essential element of the tort of malicious prosecution.

Malice is instituting the proceedings in another element of the tort of malicious prosecution. Malice is defined as the intentional doing of a wrongful act without just cause of excuse and may

be inferred from a want of probable cause.  Eaves v. Broad River Elec. Coop., 289 S.E.2d 414 (S.C. 1982); Parrot v. Plowden Motor Co., 143 S.E.2d 607 (S.C. 1965).

In McKenney v. Jack Eckerd Co., 402 S.E.2d 887 (S.C. 1991), the South Carolina Supreme Court adopted the majority rule that where criminal charges are dismissed for reasons consistent with the innocence of the accused, there is sufficient termination upon which to case the action for malicious prosecution.  Similarly, the discharge of the accused by a magistrate on a preliminary investigation is a sufficient termination to sustain an action.  Jordan v. Deese, 452 S.E.2d 838 (S.C. 1995).

Damages in an action for malicious prosecution are of two kinds: those connected with the defense against the unwarranted proceeding and those which may be viewed as consequential. Patterson v. Bogan, 198 S.E.2d 586 (S.C. 1973); Jones v. Ingles Supermarkets, Inc., 361 S.E.2d 775 (S.C.App. 1987).

## D

With respect to Plaintiff Zimbelman's contention that she was falsely arrested (or imprisoned), the record reveals that on March 13, 1995, she was directed by an official to attend a meeting of employees at the Officers' Club at Shaw Air Force Base and along with other employees; she was required to remain for approximately eight hours during which she and others were questioned and interviewed by Defendant's military officials and personnel of the Office of Special Investigations; that the restraint of Plaintiff Zimbelman by Defendant's agents was against her will and it was intentional; that the restraint was not based upon valid charges that she had violated the law and was not based upon probable cause.  Therefore, Plaintiff Zimbelman was falsely imprisoned by Defendant's military officials and Special Investigative personnel.

**E**

With respect to the Plaintiff Karen Michalik's contention that she was falsely arrested (or imprisoned), the record reveals that on March 13, 1995, she was directed by an official to attend a meeting of employees at the Shaw Air Force Base Officers' Club to bid farewell to Plaintiff Rita Zimbelman, who was scheduled to leave Shaw and become the manager of the Dobbins Air Force Base Officers' Club. She attended the meeting as directed. Contrary to the stated purpose of the meeting, Plaintiff Michalik and other employees were accused of various criminal acts, and they were required to remain for approximately eight hours, during which she and other employees were interviewed and questioned by Defendant's military officials and officials of the OSI. The record establishes that the restraint of Plaintiff Michalik was against her will; it was intentional; it was not based upon charges that she had violated the law and was not based upon probable cause. Therefore, Plaintiff Michalik was falsely imprisoned by Defendant's military officials and Special Investigative personnel.

With respect to Plaintiffs' contentions that they suffered the intentional infliction of emotional distress, the Court observes that the Federal Tort Claims Act does not authorize relief under the cause of action known as the intentional infliction of emotional distress. However, South Carolina law approves the award of damages based upon mental anguish and embarrassment.

**F**

With respect to Plaintiff Zimbelman's contention that she was maliciously prosecuted, the record establishes that: (1) an original judicial proceeding was instituted in this Court, charging Plaintiff Zimbelman with the commission of criminal acts; (2) the action was taken by or at the instance of personnel of the OSI, who were agents or employees of the United States; (3) the proceeding was terminated in Plaintiff Zimbelman's favor; (4) the proceeding was instituted pursuant to malice by personnel of the OSI; (5) the proceeding was instituted despite the absence of probable cause, and (6) Plaintiff Zimbelman has suffered injury or damage.

**G**

Plaintiffs presented Dr. Oliver Wood, an Economist, who testified concerning the economic loss suffered by each Plaintiff.

**1.**

As to Plaintiff Zimbelman, Dr. Wood explained the process he followed and utilized in calculating Plaintiffs' total economic loss and testified that in his opinion the Plaintiff Zimbelman suffered a total estimated loss of $387,990.[5]

---

[5]Testimony of Dr. Oliver Wood, Transcript Vol. IV, pp. 4-60– 4-61.
Our court system requires that when we consider money flows in the future, but in fact those money flows must be paid now—and discounted to present cash value. I have discounted those future money flows at a rate of five percent compounded annually. The present value of her future earning capacity is $367,270...I have subtracted her contributions to the retirement plan, added the employer contributions to the 401K, calculated her loss in retirement income from the time of termination until the time she wanted to retire, no loss from the previous period, that's $87,401, that totals $465.689. Dr. Stewart indicated that her mitigating earning capacity is $20,000 a year, again adjusted 2.56 percent–2.53 percent per year for cost of living. After making that deduction, her net loss in earning capacity was $287,840. The loss to date is $109,150, loss in the future is $278,840 making a total estimated loss of $287,990.

Q - And that is your opinion with respect to the economic loss caused by the loss of income for Rita Zimbelman? A. Yes.

In addition to the economic loss established by Dr. Wood's testimony, Plaintiff Zimbelman is entitled to other general damages that naturally and proximately result from false imprisonment. She has testified and described the humiliation, the indignity and the mental suffering which she experienced as a result of the conduct against her by the government's law enforcement and investigative personnel. These include the fact that, in addition to the loss of employment at the Dobbins Air Force Officers' Club, her furniture and other belonging had been loaded into moving vehicles, she had already vacated the housing that she and her children occupied at Shaw Air Force Base; she was temporarily without housing accommodations; she had to sleep in her automobile for a time until a friend provided her with a trailer to sleep in; her children had to live with friends until suitable accommodations were found; she had to endure public scorn and embarrassment; all as a proximate result of the conduct of Defendant's employees and investigative agents. She was further embarrassed and held up to public humiliation when subjected to a public trial in the groundless prosecution to which she was subjected. Dr. Follingstad also testified that Ms. Zimbelman suffered a "Major Depressive Episode" which lasted approximately two months. Therefore, Plaintiff Zimbelman is entitled to general damages in addition to the economic loss testified to by her expert witness, Dr. Wood.

2.

Plaintiffs' economist Dr. Wood has testified that in his opinion the Plaintiff Karen Michalik has suffered a total financial loss in the sum of $96,457 plus $293,951 which is a total of $390,408.

As he did concerning Plaintiff Zimbelman, Dr. Wood explained the method and process he utilized in reaching that opinion.[6] See testimony of Dr. Wood, Tr. Vol. IV, pp 4-67--4-69.

Thus, the damages suffered by Plaintiff Michalik are principally economic. Additionally, she has testified that she was embarrassed and humiliated and exposed to scorn and ridicule. Such things as humiliation, indignity and mental suffering are general damages that naturally and proximately result from false imprisonment. Additionally, Dr. Follingstad testified that Ms. Michalik suffered a "Major Depressive Episode" which lasted approximately nine months. Ms. Michalik is entitled to recover these general damages in addition to the economic damages discussed above.

## Conclusion

Upon consideration, the Court concludes that both Plaintiffs are entitled to judgment against Defendant:

  1.  The Clerk shall enter judgment for Plaintiff Rita Zimbelman in the sum of $887,900.[7]

---

[6]"I estimated Ms. Michalik's loss in earning capacity for the first year after her termination, using what she had earned in 1994, it was about $8,300. So, her loss for the balance of '95 was $6,658, and '96, $1,664. The balance of '96, $24,800 and then $31,000 for '97, '98 and '99...The total earning capacity loss to date would be $112,172. Deducting her contribution to the retirement plan of one percent, adding in the employer matching for the 401K has a subtotal of $115,287. I deducted what she has earned since that time as a mitigating earning capacity, it comes to $18,330, thus produces a net loss of $96,457. I projected her loss in earning capacity to normal Social Security retirement age 66.17. I assumed an average annual cost of living adjustment of 2.53 percent, representing the average annual increase in the consumer price index over the last six years. I have reduced to present value her expected earning capacity using a rate of five percent compounded annually, and that's $516,378. Then Chart 3, I have deduced her contribution to the retirement plan of one percent, added her 401K matching contribution, calculated her loss in their retirement fund and that produces a subtotal of $589,810. Mitigating earning capacity, I have used Dr. Stewart's estimate of $8 to $10.06, I used the midpoint of $9.03. I adjusted that for inflation at 2.53 percent which produced a mitigating earning capacity of $295,859...Total financial loss for Ms. Michalik is the sum of $96,457 plus $293,951, makes a total of $390,408."

[7]This award includes the amount testified to by Plaintiffs' expert, Dr. Wood, and it includes an additional amount of $500,000 as general damages.

2.      The Clerk shall enter judgment for Plaintiff Karen Michalik in the sum of $790,408.[8]

IT IS SO ORDERED.


                                                s/Matthew J. Perry, Jr.
                                                Senior United States District Judge

October 15, 2010

Columbia, South Carolina

---

[8]This award includes the amount testified to by Plaintiffs' expert, Dr. Wood, and it includes an additional amount of $400,000 as general damages.